# COURT OF APPEALS OF TEXAS.

## GALVESTON TERM, 1889.

---

### No. 6185.

### JAMES STOUARD *v.* THE STATE.

1. PRACTICE—CONTINUANCE.—The statute under which one of plural defendants, whether jointly or separately indicted, by filing his affidavit to the effect that he verily believes there is no evidence against his co-defendant, and that the testimony of his co-defendant is material to his own defense, may require that his co-defendant be first tried, can not, independent of other sufficient showing, be held to operate a continuance of his case to secure the testimony of his co-defendant. When arraigned in the district court of Shackelford county, to which the venue had been changed from Stephens county, the defendant in this case filed an affidavit setting forth that Jane Stouard was charged by separate indictment with the same offense; that the indictment against Jane Stouard was still pending in the district court of Stephens county; that the testimony of the said Jane Stouard was material to his defense, and that he verily believed there was not sufficient evidence to convict the said Jane Stouard; upon which affidavit he prayed the court to order that the said Jane Stouard be first tried, and that his trial be continued in order to enable him to secure the testimony of said Jane Stouard, if acquitted. *Held*, that the court did not err in refusing to continue the case to await the trial of the co-defendant.

2. SAME—DILIGENCE.—The application for continuance recited also the absence of two material witnesses. Overruling the same for the want of diligence, the trial judge explained that, although confined in the same jail with one of the absent witnesses for months, the accused had taken no steps to secure the service of process upon him; and that, although, as shown by a previous application for continuance, the defendant knew that the other witness was an incurable invalid, and unlikely ever to be able to leave his bed, he had taken no steps to secure his deposition. *Held* that the ruling was correct.

3. MURDER—CORROBORATION OF ACCOMPLICE TESTIMONY—FACT CASE. See the statement of the case for evidence *held* insufficient to support a conviction for murder of the second degree because it rests upon the testimony of an insufficiently corroborated accomplice.

1

APPEAL from the District Court of Shackelford, on change of venue from Stephens. Tried below before the Hon. T. H. Conner.

The conviction was in the second degree for the murder of W. D. Stouard, in Stephens county, Texas, on the eighth day of April, 1887. The penalty assessed against the appellant, who is shown to be the son of the deceased, was a term of sixty years in the penitentiary.

The trial in the court below was concluded on the ninth day of May, 1888, and the appeal was prosecuted to the Austin term, 1888, of this court. The case was submitted at that branch, but was taken under advisement and transferred to Tyler for decision. The opinion reversing the judgment of the court below and remanding the cause was rendered at Tyler, on the twenty-first day of November, 1888, but, the State filing a motion for rehearing, the same was taken under advisement and the papers in the case were transferred to Galveston, where, on the twenty-fourth day of January, 1888, the motion was denied without a written opinion. The case is now reported as of the Galveston term, but, as a matter of convenient reference, under the Austin number, at which branch the record is deposited.

R. L. Williams was the first witness for the State. He testified, in substance, that he was justice of the peace of precinct No. 3 of Stephens county, Texas, and held that position on the eighth day of April, 1887. He knew W. D. Stouard in his life time. The witness, on the said April 8, 1887, held the inquest upon the dead body of the said W. D. Stouard. It was between eight and nine o'clock p. m. when witness reached the body of the said W. D. Stouard. The said body was then lying in the lot near the house of deceased,—the said lot being about one hundred yards east of the said house. It lay on the left side with the back towards the gate, which was on the south side of the lot. The jury summoned by the witness removed the body to the house, where it was examined, the witness participating in said examination. Of the two wounds found on the body, both being gun shot wounds, one entered about two inches below the right shoulder blade, and passed out about the same distance below the right nipple. The other wound was in the head, the ball entering near the right eye and passing out at the back and near the crown of the head. The opening in

the head caused by the ball was of a size between that of a fifty cent and a dollar silver piece. Its effect was to shatter the entire skull. There was powder burn on the eye brow and cheek bone. The horse lot in which the body of the deceased was found was about twelve by fourteen steps in size. Twelve or fifteen feet west of the gate in the south side of said lot, an empty cartridge shell was picked up by Mr. Childress. It was a forty-four calibre, center fire Winchester rifle cartridge shell, and it had the appearance of having been recently emptied by explosion. The ground in the lot was examined by the witness and his jury, but no indications of a struggle were found. The residence of the deceased stood about ninety or a hundred yards distant from the said horse lot gate. A stable stood in the southeast corner of the said lot, and, adjoining the said lot, in a southeast direction from the point where the body lay when witness first saw it, there was another stable. The distance between the body and the last mentioned stable was between one hundred and fifty and two hundred yards. The body was cold and stiff when the witness first saw it, and it was evident that deceased had been dead some hours. A Winchester rifle of forty-four calibre was found in the house of the deceased. The magazine of that gun contained a recently exploded cartridge shell of the same make and calibre as the shell found in the lot by Childress. The condition of that shell showed that it had been recently exploded, and the moist powder smut at the muzzle of the rifle showed that it had been recently discharged. The said Winchester rifle was of the calibre and manufacture in general use in Stephens county, and the two shells described were of the manufacture commonly used in that neighborhood. Baird lived on what was known as the Revis place, about half a mile southeast of Stouard's residence, and W. P. Love lived about half a mile southeast of the Revis place. The distances stated by witness were merely estimates.

J. D. Childress testified, for the State, that at the time mentioned by the witness Williams, he found an exploded cartridge shell in the horse lot of the deceased, at a point about three steps west from the gate. It was the shell of a forty-four calibre center fire Winchester rifle cartridge of the Union Manufacturing Company brand,—such as was in common use in the country. In the magazine of the forty-four calibre Winchester rifle which was found in the house of the deceased was found a shell of a recently exploded cartridge which corre-

sponded in calibre and brand with the shell found by witness in the lot.

Elbert C. Crow was the next witness for the State. He testified that he was the nephew of the deceased, and at the time of the killing of deceased had been living at deceased's house about three months and a half. The Stouard family consisted of deceased and his wife Jane, their three adult and two infant daughters, and their sons William and James, the defendant. Witness and all the members of the family except William, who went to Albany on the seventh day of April, ate breakfast together at deceased's house on the morning of the fatal April 8, 1887. Nothing transpired at the breakfast table on that morning to indicate even unpleasant feeling upon the part of any member of the family towards another. Immediately after breakfast the witness left deceased's house and went to a point behind Love's field, about a mile southeast from deceased's house, to cut poles. He remained at that place until about eleven o'clock, when he returned to deceased's house for dinner, which was served at an unusally early hour. The deceased, defendant, Mrs. Jane Stouard, the two small children and the witness were the only parties at dinner, or at the house. Immediately after dinner the witness left the house to take the jack to water, leaving deceased, defendant, and Mrs. Jane Stouard in the kitchen. From the house the witness went to the outside stable which was between one hundred and fifty and two hundred yards southeast from the horse lot, got the jack and led him to the tank, which was about fifty yards north of the stable lot, and which lot he passed in leading the jack from the outside stable to the tank, and again in taking the animal back to the outside stable. When he had watered the jack and put him back in the said stable, the witness started back to the house. When he had reached a point about fifty yards distant from the horse lot, he heard the report of a gun. Looking in the direction whence the report came, he saw the defendant with a gun in his hands standing at a point a little west from the horse lot gate. Immediately afterwards the defendant opened the lot gate, passed into the lot, and thence to the point in the lot where the body of the deceased was subsequently found, pointed the muzzle of the gun straight down, and discharged it. He then sprang over the partition rock fence and ran toward the house. Immediately after the first shot was fired, the witness saw Mrs. Jane Stouard, about fifty

yards distant from the lot fence, running up the hill towards the house. Witness then went to the lot gate and from that point saw the body of the deceased lying on the ground in the said lot. He then went to the house, where he found the defendant and his mother, Mrs. Jane Stouard. When he stepped on the gallery witness asked defendant: "What does that mean?" Defendant replied: "You stop!" He then seized the gun which was lying across the bed, and said to witness: "If you ever tell it I will kill you." Witness replied to that threat: "I will never tell it unless I have to." Mrs. Jane Stouard then said to witness: "If you will not tell it, I will give you two ponies, a saddle and bridle and the Revis place." She then directed the witness and the defendant to go at once to the vicinity of Jack Brown's place and hunt some jennets, as a means of keeping down suspicion against them, and not to return to the house until night. She directed witness also to tell Brown that the deceased had charged him, witness, to request him, Brown, to come to his, deceased's, house, on the morrow, and go with him to hunt horses on Hubbard creek.

Accordingly the witness and the defendant left Stouard's house at once and went to Brown's, where they arrived between one and two o'clock in the afternoon. Witness delivered the fabricated message to Brown, who asked him what the deceased was then doing. The witness, in reply, told him that deceased was at home working or peddling about the place. Witness then asked Mr. Brown if he had recently seen the Stouard jennets. Brown replied that he had, and directed witness and defendant where to find them. Witness and defendant then went to the place indicated, found the jennets, and drove them to an old ranch about two miles down the river which belonged to the deceased. They remained at that ranch until about an hour before sun down, when they went to the residence of deceased, arriving about dark. Approaching the house they saw a light, but no person in or about it. At a point near the house the defendant dismounted and directed witness to hold his horse until he could see who was in the house. He then went to the house and soon returned to witness and said: "There is not a d—d soul there." They then went to the horse lot and, after looking about, defendant said to witness: "There is nobody here; but, d—n him, he is lying out there yet." The witness and defendant then went off towards Baird's residence, en route to which they met Mrs. Baird, Mrs. Jones and Mrs.

Ellen Childress, and Pink and Scrap Stouard, all daughters of deceased. These parties informed them of the death of the deceased, and directed them to take the news to Mr. Love. Witness and defendant then went to Love's house and found Love in his lot trying to catch his horse. Love, they ascertained, had already been informed of Stouard's death by Mrs. Jane Stouard. He directed that the witness should help him catch his horse, and that defendant should go at once for the justice of the peace. Defendant left to summon the justice, and witness remained and helped Love catch his horse.

Cross examined, the witness said that the inquest upon the body of the deceased was held at the house of the deceased on the night of the fatal day. The said inquest was held by Justice of the Peace Williams and several gentlemen who sat as a coroner's jury. The witness was sworn as a witness by the said justice, and testified before the said jury that he knew nothing whatever about the killing of the deceased, and that he did not know who did it. That testimony was false, and was known by witness to be false when he delivered it. His statement to Jack Brown that deceased had charged him to ask him, Brown, to come to his house on the next day and go with him to Hubbard creek horse hunting, was also false, and known by witness to be false when he made it. He likewise consciously falsified the facts when, at the same time, he told Brown that the deceased was then at home, working or peddling about the place. Will Stouard, who had gone to Albany, was not at the house of the deceased on the night preceding the killing, and no person spent that night at that house except the deceased, his wife, daughters, the defendant and witness. The grown daughters of the deceased left the house immediately after breakfast to go to the wash place. Soon after they left, the witness left the house and went to a point beyond Love's field to cut poles, leaving only the deceased, his wife, two small children and the defendant at the house. Will Stouard got home from Albany after dark on the evening of the fatal day. Sheriff Douglass came to the house on the morning after the murder and arrested Mrs. Jane Stouard, one of her grown daughters, the defendant and witness. After the arrest Mr. Jack Brown, the gentleman previously mentioned by the witness, took witness aside and advised him to tell all, if he knew anything, about the killing. Witness falsely told Brown that he knew nothing whatever about the matter. Witness and the

other parties arrested with him were taken to Breckenridge that night by Sheriff Douglass, and were placed in jail.

At this point the witness was asked the following questions: "Did not Sheriff Douglass, after you were put in jail, ask you again if you knew anything about the killing, and try on several occasions to get you to tell him what you knew about it? Did not Deputy Sheriff Add. Sloan and County Attorney Greenwood also attempt, several times, to get you to tell what you knew about it?"

The witness replied: "I do not know whether they did or not. I will not deny that each of the persons named asked me the questions. After we were placed in jail,—I can't say how long,—Mrs. Stouard was taken out to see about employing counsel for her defense. I do not know the day on which she was taken out nor returned to the jail, nor whether it was day or night, but when she came back I asked her if she had employed counsel for me too, and she replied that she had not. Soon after this,—I don't know how long,—Douglass said to me: 'You d—d fool, don't you see they are going to saddle the whole thing on you? Why don't you tell all you know about it?' I then told him I was willing to make a statement about it. The reason I made the statement I did was that I was afraid they would saddle the whole matter on me. The statement was made in the presence of County Attorney Greenwood and Justice of the Peace Boyett. It was reduced to writing and was read over to me. I do not know whether I put my mark to the paper shown me or not. I put my mark to some paper. I do not know whether or not I was sworn, but I suppose I was. I held up my hand before the justice of the peace." In answer to a question the witness said that he presumed incarceration in the penitentiary would be the punishment inflicted for swearing falsely, but he knew of no other. Being shown a written statement,—the one marked exhibit "A,"—certified by Justice of the Peace Boyett, the witness said that, being unable to read, he was unable to identify it as the statement to which he made his mark. The witness could not remember whether or not, when he made his mark to the statement, he stated under oath that the said statement contained all that he knew about the killing of Stouard. The witness was unable now to state whether or not, when he made his statement before Justice Boyett, he said anything about going to Brown's and delivering the false message, as stated by him on this trial. He could

not remember that he had ever before told about defendant, when at the lot on the night of the fatal day, saying: "There is nobody here; but, d—n him, he is lying out there yet."

Re-examined, the witness said that on the way home from the old ranch where they left the jennets, the defendant said to him: "Dead men tell no tales, do they?" To which he replied: "I never heard of it." Defendant then said: "If you ever tell this, I will do you the same way." The witness had his reason for not disclosing the truth at the coroner's inquest. He was a comparative stranger in the country; did not know the men assembled at the said inquest; was afraid, in the first place, that defendant would kill him if he told the truth, and did not know but that the men might side with the defendant against witness for denouncing him. The witness did not intend to tell the truth about the matter until the arrival of his father from a distant county, in whose ability to protect him the witness had confidence. He decided not to wait only when Sheriff Douglass told him that defendant and Mrs. Stouard were trying to saddle the killing on him. If witness did not speak, in his statement before Justice of the Peace Boyett, about telling Brown that deceased wanted him to go horse hunting, it was because he was not asked about it.

The statement of Elbert Crow before Esquire Boyett, marked exhibit A, and certified by E. W. Boyett, justice of the peace, reads as follows: "Mr. Jim Stouard killed his father. His mother was in about fifty yards of him. They sent me to water the jack, and I was in about fifty yards of him when I saw him. He shot him once when I was in about fifty yards of him. I was in about twenty-five or thirty yards of him when he shot next one, and I went to the house and they asked me if I was going to tell it. Jim said if I did tell it he would kill me. Aunt Jane told me if I would not tell it she would give me two ponies, a saddle and the Revis place. She made us go to the river after some ponies, and told us to go to Mr. Brown's to keep down suspicion. She told us not to come back until night. As we came on back Jim told me that a dead man told no tales, and that if I ever breathed it he would kill me.

"ELBERT X̲ CROW."
<span style="font-size:smaller">his</span> <span style="font-size:smaller">mark.</span>

A. J. Brown testified, for the State, that the defendant and Elbert Crow came to his house on the fatal day between one and two o'clock. They came to the witness's house from a mes-

quite valley, and said they were hunting the Stouard jennets. Witness told them where he had seen the animals on that morning. In the course of the conversation that ensued Crow said to witness: "Uncle (deceased) says for you to come to his place to-morrow and go with him down Hubbard, horse hunting." Witness asked him: "What was your uncle doing when you left him?" Crow replied: "Piddling about the place, not doing much of anything." Defendant and Crow soon left witness's place, going towards the place indicated by witness as the place where they would find the jennets. Fifteen or twenty minutes later witness saw them driving the jennets towards Stouard's old river ranch. He did not see them again on that day. Witness went to Stouard's house on the next morning and then learned of Stouard's death. Sheriff Douglass and other parties were present, engaged in an effort to trace the murderers. The witness took Crow aside and asked him if he knew anything whatever about the killing or who did it. Crow said that he knew nothing whatever about it. Douglass, after arresting Crow and defendant, placed them in witness's charge. Witness took defendant and Crow to the horse lot. They appeared to be very much "down" and weak in the knees. Crow appeared to be more excited than defendant.

W. P. Love testified, for the State, that Mrs. James Stouard came to his house about dusk on the fatal day and told him that her husband had been killed, and asked witness to go to the house to attend to matters for her. Soon afterwards, and while witness was trying to catch his horse, defendant and Crow arrived with the same report. Witness told defendant to go after the justice of the peace, and he left for that purpose. Crow helped witness to catch his horse. Witness then went to Stouard's house, where he found Mrs. Jones, Stouard's daughter. They went to the lot together, where witness held the lamp for Mrs. Jones to examine the body of her father.

J. W. Stouard, brother of the defendant and son of the deceased, testified, for the State, that he went to Albany on the day before the killing and got back about nine o'clock on the night of the fatal day. Deceased owned a forty-four calibre Winchester rifle.

Mrs. Jones, the daughter of the deceased and sister of the defendant, testified, for the State, that at the time of the homicide she lived at the house of Mr. Baird, on the Revis place. It was about dark when she first saw the body of her father.

Witness and her four sisters, when they heard of the killing, started to the house from Baird's. En route they met defendant and Crow. Witness sent them to Love's with the news. When Love arrived he and witness went to the lot and examined the body.

The State having closed, the defense called Sheriff Douglass, of Stephens county, as its first witness. He testified that he reached Stouard's residence on the morning after the killing, and during the day arrested the defendant, his mother, one of his sisters and the State's witness, Crow, and took them to Breckenridge, where he put them in jail. From the time that he placed them in jail until the following Monday evening, the witness, with few and short absences, remained in the jail with the parties. During this time he did all that he could to induce Crow to tell what, if anything, he knew about the killing. In each conversation that he had with Crow he assured him that if he knew anything, and would tell it truthfully, he would be protected. Crow refused to tell anything until on Monday evening. Mrs. Jane Stouard was taken from jail on that evening to enable her to engage counsel for the defense of herself and her son. On her return Crow asked her if she had also engaged a lawyer to conduct his defense. Mrs. Stouard replied that she had not, as he could employ counsel himself. Witness then said to Crow: "You d—d fool, don't you see they are going to saddle it all on you? If you know anything you had better tell it." Crow then agreed to make a statement concerning the killing, which he subsequently did before Esquire Boyett and County Attorney Greenwood, which statement is contained in the document in evidence marked Exhibit "A." One John Essery was in jail at Breckenridge during the time that defendant was confined therein. Essery was charged with horse theft, and the deceased was one of the witnesses against him. One Wilcox was also in jail with defendant, but was released on bail a month or two before the change of venue in this case was ordered. Wilcox's people lived in Stonewall county. Witness did not know where Wilcox was at the time of the killing of Stouard.

Mrs. Ellen Childress, daughter of the deceased, testified, for the defense, that early on the fatal morning, she and her grown sisters went from home to the wash place, about a mile distant from the house of deceased, where they remained all day washing. About eleven o'clock the witness's mother, Mrs. Jane

Stouard, and her small daughters came to the wash place where she remained, helping with the wash until nearly night. They got home between sun down and dark, and discovered the dead body of W. D. Stouard. Mrs. Stouard went at once to Mr. Love's, and witness and her sisters to Mr. Baird's to give the alarm. The witness did not go home from the wash place until the washing was finished just before night. Witness and her grown sisters, when they left home, left there the defendant, the deceased, Mrs. Jane Stouard, the two small children and the State's witness, Crow.

*Veale & Son* and *DeBerry & Wheeler,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. This conviction is for the homicide of W. D. Stouard, the appellant being convicted of murder in the second degree, with punishment fixed at sixty years in the penitentiary.

Mrs. Jane Stouard was separately indicted for the same offense, the indictments against each being presented in the district court of Stephens county, at the May term, 1887. When the case was called at the said term, the defendant James Stouard answered ready. Afterwards, on May 25, 1887, after having exhausted a venire of two hundred men, the district attorney moved for a change of venue to Shackelford county, because of the failure to procure a jury. Thereupon it was agreed by the defendant that the case might be sent to Shackelford county. At the same term the case of The State v. Jane Stouard was continued. Now on November 11, 1887, the case being in the district court of Shackelford county, the defendant filed his first application for continuance for certain witnesses, his mother, Jane Stouard, not being one of the number. The case was continued at the instance of the defendant. This case was called for trial on May 4, 1888, in the district court of Shackelford county, whereupon the defendant presented his second application for continuance for want of the testimony of Mrs. Jane Stouard, and because of the absence of other witnesses. The application was denied and defendant excepted, reserving his bill.

Mrs. Stouard's testimony being material and probably true, did the court err in refusing to continue the case until she could

be tried, and, if acquited, be permitted to testify for the defendant? Whether indicted jointly or separately, if the offense grew out of the same transaction, either defendant, by making proper affidavit, is entitled to have the party for whose evidence said affidavit is made first tried. (Acts of 1887, p. 33.) By this article it is also provided that the making of such affidavit does not, without other sufficient cause, operate as a continuance to either party. This would seem to settle the controversy as to a continuance for the want of the testimony of Mrs. Jane Stouard. Independent of this provision, appellant is chargeable with the grossest negligence with regard to this matter, and upon this ground the court acted correctly in denying the application. Appended to the application to continue there is an explanation of the facts and circumstances relating to the other parties named in the application, which completely sustains the court in refusing to continue for the want of their testimony, and hence there was no error in refusing the application.

The witness Elbert C. Crow was evidently an accomplice, if not the sole perpetrator of the crime. The law applicable to the testimony of such a witness was correctly given in charge to the jury. Crow being an accomplice, the counsel for appellant earnestly contends that he is not corroborated in such manner as will justify a conviction. We have examined the statement of facts with great care, and are of the opinion that the evidence does not sufficiently corroborate the testimony of the accomplice witness.

Natural affection speaks strongly against such an act as the one charged—the son slaying his father. There were no former grudges, no antecedent menaces, no bad blood, no motive for the crime shown. The deceased's family consisted of his wife, James the accused, William, three daughters and two small children. William was at Albany when the killing occurred. The sisters were not at home, but were a mile away, washing. Crow states that at dinner there were at the house the deceased, his wife, defendant and two small children. One of the girls who was washing states that her mother came to the wash place with the two children about eleven o'clock. If this is true, the homicide may have occurred after the wife and two children had left the house for the washing place. Here we have a conflict between a daughter of the deceased and an avowed accomplice.

But again, Crow was also a member of the family. He had been living with the deceased about three months, and had access to the gun as well as did James Stouard—the gun was the property of the deceased. Crow and defendant lived with deceased. Now let us concede that deceased was shot with his own gun. Why not infer that Crow shot him? Let it be conceded that there was no motive inducing Crow to commit the deed, neither is there any shown prompting the son or wife. Their opportunity was the same, the gun being as convenient to the one as to the other. Then why infer the son's guilt and not Crow's? Nature revolts against the crime if committed by Crow, but tenfold stronger if committed by the son. Then why infer the unnatural act from facts tending equally to prove the guilt of another? The accomplice Crow repeatedly denied all knowledge of the crime. The record shows that he lied most infamously. Nor did he charge the appellant with this most unnatural deed until he was induced to believe that he would be himself accused by the appellant or his mother. In view of these facts, and in view of the fact that the accused was the son of the deceased, we again urge the question, why infer appellant's guilt and not Crow's? Where the physical facts attending the homicide show that but one party did the killing, evidence which tends with equal force to criminate several, without pointing out which, has but little force. Hence, if Crow is corroborated at all, it is so slight as to render it dangerous to sustain the conviction.

Because the testimony of the accomplice is not sufficiently corroborated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered November 21, 1888.

Motion for rehearing overruled without written opinion, January 24, 1889.